**FILED**
**November 20, 2014**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Detention of: | ) | |
| | ) | No. 31210-1-III |
| | ) | |
| KENNETH LONGSDORFF, | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |

SIDDOWAY, C.J. — In April 2009, shortly before Kenneth Longsdorff completed his sentence for a sex offender conviction, the State filed a petition to civilly commit him as a sexually violent predator under chapter 71.09 RCW. Following a 7-day trial, a jury found that the State had proved beyond a reasonable doubt that Mr. Longsdorff was a sexually violent predator and the trial court entered an order of civil commitment.

Mr. Longsdorff's appeal challenges the sufficiency of the evidence to prove beyond a reasonable doubt that he was likely to engage in predatory acts of sexual violence unless confined to a secure facility. He emphasizes the fact that the State's expert witness relied on 4 actuarial assessment tools in the course of his evaluation, and they suggested at most a 57 percent risk of reoffense after 6 years of release and a 59 percent risk of reoffense after 10 years, with 2 of the actuarial assessment tools

suggesting much lower risks of reoffense—as low as 5.5 percent at 5 years, and 9 percent at 10 years. He argues that "a 5.5% to 57% statistical probability of re-offense . . . years into the future" does not constitute proof beyond a reasonable doubt. Br. of Appellant at 11.

The State's expert witness followed a "multi-component approach" to risk assessment and testified to other evidence demonstrating Mr. Longsdorff's risk to children (including Mr. Longsdorff's long history of raping and molesting boys) and to the limitations of actuarial assessment results. Report of Proceedings (Sept. 18, 2012) (RP) at 98. Viewed in the light most favorable to the State, the evidence was sufficient. We affirm.

FACTS AND PROCEDURAL BACKGROUND

Kenneth Longsdorff has a long history of raping and molesting boys. He has self-reported sexually assaulting at least 9 boys during his lifetime. He first acted on his sexual fantasies when he was 17, with the son of some acquaintances. Mr. Longsdorff both anally and orally raped the son for 3 to 4 years. When the boy got older, Mr. Longsdorff was no longer interested because he was "too old for him." Ex. 53, at 43. Mr. Longsdorff also engaged or attempted to engage in sexual contact with the boy's 2 younger brothers.

At 20, Mr. Longsdorff was living in San Jose, California. A young Mexican boy, age 8 to 10, lived next door. Mr. Longsdorff became acquainted with the boy and over

2

approximately the next 4 years, Mr. Longsdorff sexually assaulted him more times than Mr. Longsdorff could count.

In 1980, when Mr. Longsdorff was around 30 years old, he married a Spanish speaking woman, with whom Mr. Longsdorff could not even communicate, given the language barrier. The woman had a son who was 9 years old. While married, Mr. Longsdorff engaged in multiple assaults of his stepson, including oral and anal rape. Mr. Longsdorff again abused the boy more times than he could count.

Although many of the sexual assaults went unreported, Mr. Longsdorff was ultimately charged and convicted of several sexual offenses committed against boys, involving acts similar to those detailed above. In 1992, he was convicted of rape of a child in the second degree, rape of a child in the third degree, and 2 counts of rape of a child in the first degree. In 1993, he was convicted of child molestation in the first degree. Following the 1992 conviction, Mr. Longsdorff participated in sex offender treatment at the Monroe Correctional Complex, where he completed treatment in the Sex Offender Treatment Program.

Nonetheless, in April 2009, shortly before Mr. Longsdorff completed his sentence, the State filed a petition in Walla Walla County Superior Court to civilly commit Mr. Longsdorff as a sexually violent predator (SVP) under chapter 71.09 RCW. The court remanded Mr. Longsdorff to the custody of the Special Commitment Center (SCC) at McNeil Island and ordered him to submit to interviews and testing. At the SCC he was

3

classified as having special needs due to his limited intellectual functioning. Mr. Longsdorff has a full scale IQ of 66-76, which is considered to be mildly mentally retarded.

Mr. Longsdorff's first civil commitment trial ended in a mistrial after it was discovered that the Department of Social and Health Services had failed to produce a 2010 evaluation of Mr. Longsdorff to the parties. The civil commitment proceeding came on for a second jury trial in September 2012. While many witnesses were called during the 7-day trial, the State's principal witness, whose testimony is central to this appeal, was Dr. Henry Richards, a forensic psychologist who specializes in assessing sexually violent predators.

Dr. Richards had reviewed documentation of Mr. Longsdorff's criminal, institutional, and mental health history and had conducted a clinical interview and psychological testing of Mr. Longsdorff. Dr. Richards explained to the jury that in arriving at an opinion as to Mr. Longsdorff's risk of offending in the future, he had followed a generally accepted "multi-component approach," pursuant to which he had considered (1) Mr. Longsdorff's mental disorders, (2) the results of actuarial risk assessment testing, (3) Mr. Longsdorff's history of offenses and offense patterns, (4) psychopathy, and (5) dynamic risk factors. Dr. Richards also considered protective factors that might reduce Mr. Longsdorff's risk of offending.

4

Based upon his interviews and review of materials, Dr. Richards diagnosed Mr. Longsdorff with several mental disorders: pedophilia, alcohol abuse, anxiety disorder not otherwise specified (NOS), cognitive disorder NOS, borderline intellectual functioning, and personality disorder NOS.

Mr. Longsdorff focuses in this appeal on the actuarial tests that Dr. Richards used to assess Mr. Longsdorff's risk of reoffense. Dr. Richards used four: the Static-99, the Static 2002R, the Minnesota Sex Offender Screening Test Revised (MnSOST-R), and the Sex Offender Risk Assessment Guide (SORAG). The 4 tests are generally accepted in the psychological community as valid predictors of potential sexual recidivism. Mr. Longsdorff's Static-99 score indicated a 5.5 percent chance of reoffending within 5 years, and a 9 percent chance within 10 years. The Static 2002R indicated that Mr. Longsdorff had a 12.3 percent chance of reoffending within 5 years, and a 18.2 percent chance of reoffending in 10 years. According to the MnSOST-R, individuals who scored in Mr. Longsdorff's category have a 57 percent chance of reoffending within 6 years after release to the community. Finally, the SORAG test placed Mr. Longsdorff in a category having a recidivism rate of 45 percent over 7 years, and 59 percent over 10 years.

The opinion reached by Dr. Richards, and that he expressed to a reasonable degree of psychological certainty, was that Mr. Longsdorff presented a high risk of engaging in predatory acts of sexual violence against children if released into the community.

Mr. Longsdorff presented the testimony of his own expert, Dr. Richard Wollert. Dr. Wollert disagreed with Dr. Richards's diagnosis of pedophilia and expressed the opinion that Mr. Longsdorff was not likely to reoffend. He relied on only one actuarial instrument in reaching his opinion.

The jury found that the State had proved beyond a reasonable doubt that Mr. Longsdorff was an SVP, and the trial court entered an order of civil commitment. Mr. Longsdorff appeals.

## ANALYSIS

Although SVP commitment proceedings are civil in nature, the criminal standard of review applies to sufficiency of the evidence challenges. *In re Det. of Thorell*, 149 Wn.2d 724, 744, 72 P.3d 708 (2003). The evidence is sufficient if, when viewed in the light most favorable to the State, a rational trier of fact could find each essential element beyond a reasonable doubt. *Id.* As in criminal cases, we defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Liden*, 138 Wn. App. 110, 117, 156 P.3d 259 (2007).

To commit a person as an SVP, the State must prove beyond a reasonable doubt that the individual (1) has been convicted of or charged with a crime of sexual violence; (2) suffers from a mental abnormality or personality disorder; and (3) is more likely than not, because of the disorder, to engage in predatory acts of sexual violence if not committed to a secure treatment facility. RCW 71.09.020(18). Civil commitment only

6

satisfies due process if the State proves an individual is "mentally ill and currently dangerous." *In re Det. of Moore*, 167 Wn.2d 113, 124, 216 P.3d 1015 (2009).

Mr. Longsdorff contends that the State's evidence was insufficient to prove that he is likely to commit predatory acts of sexual violence if released. He focuses on the results of Dr. Richards's actuarial testing, arguing that the "actuarial tests that Dr. Richards employed did not constitute evidence of what current risk Mr. Longsdorff was for re-offense. Rather, they only provided an assignment of risk many years into the future." Br. of Appellant at 10. He also argues that because his scores on the actuarial tests for the most part did not exceed 50 percent, they did not indicate a sufficient likelihood that he would reoffend. *Id.* at 10-11. He submits that "5.5% to 57% statistical probability does not constitute proof beyond a reasonable doubt and is a preposterously wide range of probability." *Id.* at 11.

Mr. Longsdorff's argument is too narrowly focused on one category of evidence to be persuasive. Dr. Richards testified that the current consensus in the field is that one cannot rely solely on actuarial science in determining whether an individual is likely to reoffend. And on that score, Mr. Longsdorff's own expert, Dr. Wollert, was in agreement. Dr. Wollert acknowledged that developers of the actuarial instrument he employed believe that actuarials cannot take into account all potentially relevant risk factors in SVP cases. Dr. Wollert also testified that actuarial data cannot determine whether a person is likely to reoffend.

Dr. Richards provided the jury with a detailed explanation of the steps he had taken in arriving at his opinion of Mr. Longsdorff's likelihood of reoffending. He first addressed Mr. Longsdorff's mental disorders, explaining that the presence of mental disorders may either increase or lower the risk of reoffense. He testified that Mr. Longsdorff's pedophilia limits his empathy toward children and impairs his ability to avoid situations that would lead to sex offending. He testified that Mr. Longsdorff's cognitive disorder makes it difficult for him to apply any treatment concepts to which he is exposed. He testified that Mr. Longsdorff's alcohol abuse disinhibits any barriers to offending that Mr. Longsdorff may have, and his anxiety disorder may cause him to seek alcohol or sexual activity to relieve stress. He found that all of Mr. Longsdorff's disorders increase his risk of offending in the future.

Dr. Richards next explained his use of 4 actuarial instruments. Actuarial assessment involves statistical analysis to identify a number of risk factors that assist in the prediction of future dangerousness. *Thorell*, 149 Wn.2d at 753. Dr. Richards acknowledged that while actuarial instruments have limitations because of the small sample sizes on which they are based, they nevertheless provide useful information. He testified that the Static-99R and Static 2002R were designed to assess factors that are objective and easy to measure, while the MnSOST-R and SORAG take clinical factors into account and require more clinical judgment by the assessor. He concluded that Mr. Longsdorff's lower recidivism rates suggested by the Static instruments indicated that

8

Mr. Longsdorff's risk was more related to clinical factors. When asked whether actuarials overestimate or underestimate risk, Dr. Richards answered that while they do both, "for the most part they greatly underestimate risk." RP at 110.

Dr. Richards also explained to the jury that he had scored Mr. Longsdorff on the PCL-R, an instrument that measures psychopathy. Its results showed that Mr. Longsdorff has little empathy, lacks remorse, and has a high capacity to manipulate others.

Dr. Richards told the jury about Stable 2007, an instrument designed to look at dynamic factors. Unlike static factors that tend not to change, dynamic risk factors are aspects of an individual that may change. Dr. Richards explained that he used Stable factors, but not the Stable test, to look at the dynamic factors that might affect Mr. Longsdorff's chances of reoffending. Dr. Richards found that the most important factors to consider related to intimacy—specifically, the capacity for relationship stability, social rejection, and deviant sexual preference. Dr. Richards found that Mr. Longsdorff does not have a lot of history of being able to form a relationship, particularly an intimate relationship, where a child is not involved. Mr. Longsdorff feels that there is no one to help him, and this injustice justifies his offending. Finally, Dr. Richards found that Mr. Longsdorff has a deviant sexual preference in that he is orientated toward children.

A final consideration that Dr. Richards explained to the jury was any protective factors, which he explained are "aspects of the individual that have been found to lower their chance for reoffending." RP at 116. The first potential protective factor he

9

considered was community. He testified that the community factor did not apply because Mr. Longsdorff had not been in the community for a period of time without committing any crime or sex offense. The next was life expectancy. Dr. Richards testified that Mr. Longsdorff's "age is taken into account in the actuarial, but I think his remaining life span is ample enough to reoffend and is his health and ability, his inner personal ability and social ability are good enough for him to reoffend. So I don't think he has that protective factor." RP at 117. A third was sex offender treatment. Dr. Richards expressed his opinion that although Mr. Longsdorff had participated in sex offender treatment, he "did not get it," because his participation in treatment was "conditioned by the many limitations he has." RP at 119. It was Dr. Richards's view that the core issue of Mr. Longsdorff's orientation toward children was not addressed and Mr. Longsdorff, "still doesn't understand it, doesn't really understand why he's this way, and does not have the skills to control his risk." RP at 120. The final protective factor considered was release environment. A release environment can be a protective factor because, "if an individual is being released to an environment that is supportive and not like the environment that they previously reoffended in, that's going to be . . . protective." *Id.* Dr. Richards told the jury that Mr. Longsdorff's plan upon release was to get an apartment, "go to the race track, become rich, get a dog, [and] avoid children." RP at 121. Dr. Richards stated that this was not a protective plan, because alcohol is served at race tracks and dogs are a magnet for children.

10

After reviewing each risk assessment component, Dr. Richards summarized his opinions as follows:

A.      . . . [Mr. Longsdorff's] pedophilia consists of a strong orientation, emotional and sexual, toward relationships with children. He has had limited treatment gains, a cognitive disorder that would make it difficult for him to use the methods and techniques that he is—or to remember the methods and techniques that he has been exposed to.

He has an untreated alcohol abuse problem. Until the last few years he actually would state that he had no intentions of ever stopping drinking. The—his ongoing impulsivity and as well as his anxiety will cause him to act, you know, act out rather than to think his way through the difficulties he has. I think limitations I've mentioned. At the current time, all those disorders contribute to increasing risk.

. . . .

Q.      You've stated that you have the opinion that Mr. Longsdorff is likely to engage in predatory acts of sexual violence if not confined. What types of acts do you expect in your opinion to be committed?

. . . .

A.      Predatory acts. More specifically, I would expect him to engage in a relationship with an adult to get closer to children, and become closer to children. He is now in the grandma/grandpa set, and will have lots of opportunities to be exposed to children. And I think that the, that he will attach himself to a family system with children and offend against one or more children.

. . . .

Q.      In your opinion can Mr. Longsdorff be safely released into the community at this time?

A.      No.

RP at 124-25.

When all of Dr. Richards's testimony is considered, Mr. Longsdorff's emphasis on combining actuarial testing results and characterizing the result as "a preposterously wide range of probability," with some indications of low probability, is not persuasive. It is far

11

too narrow an approach, given Dr. Richards's explanation of the bases for his opinion, and too dismissive of Dr. Richards's explanation of the limitations and differences in actuarial tests.

Viewing all of the evidence in a light most favorable to the State, a rational juror could have found beyond a reasonable doubt that Mr. Longsdorff was likely to commit sexually violent crimes if not confined.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Lawrence-Berrey, J.

12